**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 22-cr-157 (RDM)** |
| **v.** | : | |
| | : | |
| **JUSTIN MICHAEL SMITH,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Justin Michael Smith to 90 days of incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution.

I.      **Introduction**

Smith, a 22-year-old from Garfield Heights, Ohio, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1] Smith pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 90 days of incarceration followed by 36

---

[1] Although the Statement of Offense in this matter, filed on May 3, 2022, (ECF No. 1) reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

months of probation is appropriate in this case because Smith: (1) entered the Capitol after he had observed rioters in physical confrontation with police officers, all the while taking videos of the riot; (2) later glorified his conduct on the internet; (3) after his arrest, minimized his conduct during a voluntary interview with the FBI, suggesting that he was only in the Capitol for "30 seconds or a minute"; (4) failed to express any remorse or contrition for his actions; and (5) continues to demonstrate a blatant disrespect for the rule of law, having failed to abide by the conditions of his pretrial supervision. As explained in further detail below, Smith's violations including multiple positive tests for THC, at least one positive test for cocaine, a failure to report for counseling and drug testing, at least one pretrial arrest, failure to report to his probation officer, and having unauthorized firearms in his home. Further, the during the entire period of the defendant's pretrial supervision, Smith has had three outstanding warrants involving traffic violations that have been left unresolved, despite multiple admonitions from the probation office and this Court. As of the date of this filing, to the Government's knowledge, the defendant has *still* failed to address these warrants. A period of incarceration is a just punishment in this case, and is also necessary to promote respect for the law.

Finally, the Court must also consider that Smith's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Smith's crime support a sentence of 90 days' incarceration, followed by 36 months of supervised release.

### Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 25 (Statement of Offense).

*Defendant Smith's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Smith traveled with a number of other individuals by bus to Washington, D.C., from his home in Ohio, to protest the results of the 2020 Presidential Election. Along with other individuals who rode the bus, Smith made his way to the east side of the Capitol building on the morning of January 6, 2021, and listened to the former President's speech at the "Stop the Steal Rally" over the loudspeaker.  Smith brought with him a black Trump flag that read "Trump 2020, the Sequel.  Make the Liberals Cry Again."

Smith observed members of the mob on the east side of the Capitol Building become more agitated with police after the former President stated that people should go to the Capitol, and he saw the mob push up against bike racks and against police officers who were defending the Capitol grounds.  Smith watched overwhelmed police officers retreat to the East Rotunda Doors just outside the Capitol Building, and he also observed multiple people being "trampled" and pepper-sprayed as the mob descended onto the East Rotunda Doors.  Despite witnessing the havoc, and despite witnessing police officers doing their best to keep rioters like himself out of the building, Smith entered the Capitol through the East Rotunda Doors at approximately 2:53 p.m.

*Image #1 (screenshot taken from a third-party video showing Smith outside the East Rotunda Doors):*



While inside, Smith wandered around the entryway near the East Rotunda Doors, and eventually made his way into the Rotunda itself while carrying his black flag and taking videos and photos of the riot.  At one point, Smith acquired a set of zip ties from a fellow rioter, later stating in his interview that he thought it would be "cool" to have them.  Smith was pepper-sprayed as he exited the Capitol building.

*Image #2 (third-party screenshot showing Smith inside the Capitol near the East Rotunda Doors):*



Smith exited the Capitol building at approximately 3:04 p.m., having spent just over ten minutes inside. After exiting the Capitol, Smith went back to the bus he arrived in, and when he eventually got back to Ohio, he posted a picture of himself on social media on or about January 12, 2021, wearing the same clothing he was wearing on January 6, 2021, with an image that stated "When Tyranny Becomes Law, Resistance Becomes Duty." A screenshot from Smith's social media account is included below along with another photo, taken by a third-party, that shows Smith triumphantly raising his fist in the air, waiving his flag, and celebrating the breach of the Capitol building:

*Image #3 (screenshot taken from Smith's Facebook account):*



*Image # 4 (third-party photograph showing Smith wearing the same clothing as Image #3 on January 6, 2021; Smith is on the right, triumphantly raising his hand):*



*Defendant's Interview*

On May 4, 2022, after being told there was an active warrant for his arrest, Smith self-surrendered to the FBI and gave a voluntary post-arrest interview.  During the interview, he admitted traveling to Washington by bus with several other individuals (mostly unknown to Smith), and that he wanted to be at the Capitol on January 6, in part because in his view, "the

election was rigged," and he was "trying to make history."  Smith also stated that he was "there to support our President."

Smith described how he saw many rioters pushing up against police officers both on the restricted grounds on the east side of the building, as well as on the East Rotunda steps and the East Rotunda doors.  Smith witnessed other rioters getting "trampled' and pepper-sprayed.  He also witnessed officers trying to "shut the doors" at the East Rotunda doors, and stated that other rioters were "pissed" when the police tried to keep people out of the building.  He stated that one rioter told him that if police become aggressive, he should "punch them in the face."  Smith denied engaging in acts of violence himself, but admitted that he saw other rioters engage in violence.

Smith asserted that he tried to discourage others from property destruction, violence and theft, but he admitted that he acquired zip ties from a fellow rioter as he was exiting the Capitol Building, stating that it would be "cool if [he] had them as a souvenir."  Smith also stated that he used to show the zip ties to his friends.  Smith initially told the FBI he thought he was in the building for only about 30 seconds or a minute, but later stated that he could not be sure how long he was in the building.  Smith said he thought the former President was going to enter the Capitol with the mob, but also said that "if anything was planned, I don't know…I was caught up in the moment."  Smith later admitted that he knew at the time he entered the Capitol that he did not have permission to enter the building.

*The Charges and Plea Agreement*

On May 3, 2022, the United States Attorney charged Smith by complaint with Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1) (Count 1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count 2); Disorderly Conduct in a Capitol Building or Grounds, in violation of 40

U.S.C. § 5104(e)(2)(D) (Count 3); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count 4).  On May 4, 2022, law enforcement officers arrested Smith after he self-surrendered in Ohio.  On May 5, 2022, the United States charged Smith by a four-count Information with violating the same statutes listed above.  On December 20, 2022, pursuant to a plea agreement, Smith pleaded guilty to Count 4 of the Information, charging him with violating 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Smith agreed to pay $500 in restitution to the Architect of the Capitol.

## II.     Statutory Penalties

Smith now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, Smith faces up to six months of imprisonment and a fine of up to $5,000.  Smith must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## III.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 90 days of incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).  The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while

staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021).   While assessing Smith's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.   Notably, for a misdemeanor defendant like Smith, the absence of violent or destructive acts is not a mitigating factor.   Had Smith engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Smith's case is his reaction to the acts of violence and mayhem that he witnessed before he entered the Capitol.   Smith witnessed other rioters engage in physical confrontations with police officers on the restricted grounds of the Capitol, and at the entrance to the Capitol at the East Rotunda doors.   Smith saw rioters push up against police officers, who were trying to defend the building from the onslaught of the mob.   He saw rioters pushing up against metal barriers on the restricted perimeter.   At the East Rotunda steps he saw other people being trampled, and pepper-sprayed.   Smith himself was pepper-sprayed at one point during his breach of the Capitol building.   Smith decided to take advantage of this chaos, and entered the Capitol after overwhelmed police officers had to retreat in the face of this onslaught. At any point after having witnessed these violent acts, and the efforts by police to keep the rioters off restricted grounds and out of the building, Smith could have decided to turn around and leave. Instead, he continued on, entered the Capitol building, and spent over ten minutes inside the building where he continued to record the riot.

Another important fact for this court to consider is the fact that to date, Smith has not shown real remorse for his actions, and that after the riot, he bragged about his accomplishments on social media.   As noted above, on January 12, 2021, Smith posted a picture of himself with the graphic that read "When Tyranny Becomes Law, Resistance Becomes Duty."   Smith was fully aware of

the scope of his conduct on January 6, 2021. Smith was not "caught up in the moment" on that day, he had a purpose for being at the Capitol. Indeed, he stated to the FBI that he "wanted to make history." Smith was unhappy with an election result that he disagreed with, and he wanted to demonstrate his frustration with the government on January 6, 2021. He was not sorry for what he did. On the contrary, he glorified his conduct on Facebook, and suggested that his actions were an act of patriotism.

Although Smith gave a voluntary interview with the FBI after he self-surrendered, his statements to the FBI minimized his conduct. Smith tried to tell the FBI that he was in the Capitol for only "30 seconds or a minute", when in reality, he had spent over ten minutes inside the Capitol building. Further, Smith himself did not seem to grasp the illegitimate and reprehensible nature of his own conduct, suggesting that he was only there to "support the President". At no point did Smith express any regret for how he, and the mob he was with, overwhelmed police officers who were sworn to protect the Capitol, subjecting them to violence, intimidation, and physical harm. Moreover, at no point did Smith express remorse for his actions that contributed to the chaos of that day, or for the terrible impact it had on democracy.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. The History and Characteristics of Smith

As set forth in the PSR, Smith's criminal history consists of a juvenile offense (adjudicated delinquent) for carrying a concealed weapon in December 2016, and an adult conviction for a violation of a protective order in July 2020. Smith spent one day in jail for his adult conviction. Additionally, Smith has three active warrants for traffic violations including: 1) a July 2020 violation for reckless operation of a vehicle (DUI), and driving with a suspended license; 2) a July

2021 violation for speeding and driving with a suspended license; and 3) an additional violation for (date unknown) driving with a suspended license and no motorcycle endorsement.

Smith has not been compliant with the terms of his pretrial release. For a detailed list of the violations, refer to ECF No. 31. In summary, Smith has demonstrated a complete lack of respect for the Court's authority and rules. To begin with, Smith has failed to resolve the three active warrants for vehicle violations noted above, despite the fact that this Court held a hearing in which it admonished Smith for not addressing these specific violations. Smith has continued to use marijuana and has tested positive for THC on July 12, 2022, and on August 29, 2022. Smith also tested positive for cocaine on July 12, 2022. Smith regularly fails to stay in contact with his probation officer, and in November 2022, he failed to report for counseling and failed to report for drug testing. Smith was arrested on July 4, 2022 for misdemeanor aggravated menacing and drug possession charges. The charges were dismissed, however.

Smith was warned about his need to comply with pretrial release conditions on April 14, 2023, after the probation office filed its second pretrial violation report and urged action by the Court. *See* ECF No. 30. In its violation report, the Probation Office noted that Smith had not been amenable to supervision and did not stay in contact with the probation office, and has still failed to address the active warrants discussed above. At the April 14, 2023 hearing, this Court also explicitly stated that compliance with pretrial conditions is a factor that the Court will consider when imposing a sentence. Subsequently, on May 15, 2023, the probation office filed another pretrial violation report at ECF No. 31, stating that Smith failed to notify the probation office of a change in residence, and once this residence was inspected by probation, it was discovered that

the residence contained firearms and a crossbow, which are also violations of pretrial conditions.[2] The probation office also noted that Smith still had not resolved the active warrants in his name.

Smith's troubling record, and more specifically his failure to abide by the conditions of his pretrial release are important factors for imposing a sentence of incarceration in this case. Smith has clearly demonstrated that he does not take the Court's rules and conditions seriously. Smith has been explicitly warned by the Court and by the probation office on repeated occasions and has still failed to comply with his conditions. This does not give the United States great confidence that Smith has learned his lesson, nor does it show respect for the law. Accordingly, a sentence in this case must send this defendant, and the public a message that a failure to abide by these rules will be met with consequences.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

---

[2] Smith asserts that these weapons belong to the family of his fiancé who owns the house where he is staying.

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

As stated above, while Smith did not engage in violence, he took full advantage of the violence that was taking place on January 6 to enter the Capitol with a mob at his back.  Smith explicitly stated that he was there to "make history" and that he disagreed with the 2020 Presidential election results.  Smith must understand that his conduct will not be tolerated, and that participating in a riot is an unacceptable way to demonstrate frustration with an election.  More specifically, given Smith's blatant disregard for this Court's rules, he must be reminded that a failure to abide by the law will incur a serious penalty.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3]  This Court must sentence Smith based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Smith has pleaded guilty to Count 4 of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building , in violation of 40 U.S.C. § 5104(e)(2)(G).  This offense is a Class B misdemeanor. 18 U.S.C. § 3559.  Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9.  The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the court may wish to consider other cases where defendants have pled guilty to 5104(e)(2)(G) and entered the Capitol after witnessing violent acts against the police.

For example, in *United States v. Paul Von Bernewitz,* 21-cr-307 (CRC), the court sentenced Von Bernewitz to 30 days' incarceration.  Von Bernewitz was among the initial crowd who breached the metal barriers that prevented access to the closed west side of the U.S. Capitol

building.  Like Smith, Von Bernewitz watched as rioters pushed past U.S. Capitol Police Officers at metal barrier lines, and after this observed other rioters enter U.S. Capitol building.  Von Bernewitz himself persisted after seeing physical confrontations with police and circled around to the east side of the Capitol and watched as people, including his brother, pushed against police lines, eventually breaking the line and surging up the east Capitol steps towards the Rotunda doors. Von Bernewitz watched a rioter break windows and heard U.S. Capitol Police deploy flash-bangs and/or tear gas at the Rotunda doors, yet he entered the U.S. Capitol building anyway.  Like Smith, Von Bernewitz spent a relatively short amount of time in the Capitol (approximately 14 minutes), and after he was interviewed by law enforcement agents, he minimized his own culpability. Although their conduct was similar on January 6, Smith should be given a higher sentence of 90 days given his repeated failures to abide by the terms of his pretrial release.

In *United States v. Robert Bauer*, 21-cr-49 (TSC), the court sentenced Bauer to 45 days of incarceration. Smith's and Bauer's conduct on January 6 was also similar.  Like Smith, Bauer did not assault police, but treated the disorder of the riot as a spectacle, taking photos of the chaos around him during his 17 minutes in the Capitol. Bauer observed violence in the Crypt, while Smith observed violence on the East Rotunda steps.  Like Smith, Bauer never expressed remorse for his actions.  Bauer had multiple prior convictions for possession of methamphetamine and driving offenses, and like Smith, a history of repeatedly disregarding the law to do what he wanted. Although their conduct on January 6 and their criminal histories are similar, Smith's repeated failures to abide by the conditions of his pretrial release and the likelihood that he will engage in criminal conduct in the future should drive a higher sentence.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is

18

"firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.[4]

---

[4] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

---

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

## IV.     Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).[5] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Smith must pay $500 in restitution, which reflects in part the role Smith played in the riot on January 6.[6] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,734,783.14  in damages", a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of April 2022. *Id.* Smith's restitution payment must be made to the Clerk of the Court,

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 63.

**V.      Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Smith to 90 days of incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

<div style="margin-left:40%">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

</div>

By:     */s/ Christopher M. Cook*
U.S. Department of Justice
Trial Attorney (Detailee)
KS Bar No. 23860

## <u>CERTIFICATE OF SERVICE</u>

On this 21st day of June, 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

<u>/s/ *Christopher M. cook*</u>
U.S. Department of Justice
Trial Attorney (Detailee)